FILED
2005 May-24  AM 11:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| DIANA PEARSON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-02-S-3207-S |
| | ) | |
| JERRY UNDERWOOD, Deputy | ) | |
| Sheriff, in his official and | ) | |
| individual capacity as Deputy | ) | |
| Sheriff of Jefferson County; | ) | |
| MIKE HALE, Sheriff of | ) | |
| Jefferson County, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This action is before the court on the motion for summary judgment filed by defendant Jerry Underwood, a Deputy Sheriff in Jefferson County, Alabama ("Underwood" or "defendant").[1]  The sole remaining claim of plaintiff, Diana Pearson, lies against Underwood in his individual capacity, pursuant to 42 U.S.C. § 1983.[2]  Plaintiff's claim arises from Underwood's alleged destruction of her personal

---

[1]Doc. no. 25.

[2]On May 6, 2003, the court granted the motion to dismiss filed by Mike Hale, Sheriff of Jefferson County, Alabama.  *See* doc. no. 20.  On that same date, the court dismissed plaintiff's claims against Deputy Sheriff Underwood in his official capacity, as well as her state law claim for conversion.  The sole remaining claim is asserted under 42 U.S.C. § 1983 against Deputy Sheriff Underwood in his individual capacity.

property during the process of evicting her from an apartment.[3]  Upon consideration

of the pleadings, evidentiary submissions, and briefs, the court concludes the motion

is due to be granted in part and denied in part.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment

not only is proper, but "shall be rendered forthwith if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Thus, "the plain

language of Rule 56(c) mandates the entry of summary judgment, after adequate time

for discovery and upon motion, against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477

U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material

---

[3]Doc. no. 1 (Complaint).

fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)) (internal quotation marks and citations omitted).

## II. FACTUAL BACKGROUND

The following facts either are not disputed, or are stated in the light most favorable to plaintiff. *See, e.g., Saucier v. Katz,* 533 U.S. 194, 201 (2001) ("A court required to rule upon the qualified immunity issue must consider ... this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?").

Aimco Management Group ("Aimco") — which apparently was the owner of the apartment leased to plaintiff — instituted an action against her on October 25, 2000, in the District Court of Jefferson County, Alabama, for unlawful detainer and non-payment of past-due rent.[4]  Judgment by default was entered on November 8, 2000, and the court ordered that the property described in the complaint be restored to Aimco.[5]  The Jefferson County Clerk of Court issued a writ of restitution on November 30, 2000, directing "any lawful officer of the State of Alabama" to restore

---

[4]Doc. no. 26 (Defendant's evidentiary submission), Ex. B-1.
[5]*Id.*

the property to Aimco, and to collect court costs in the amount of $136.00.[6]

The writ of restitution was transmitted to the Jefferson County Sheriff's Department, and Deputy Jerry Underwood was assigned responsibility for its execution.[7] Upon receipt, Underwood attempted to contact plaintiff, to encourage her to voluntarily vacate the apartment. Underwood personally visited the apartment at least eight times between November 30, 2000, and January 3, 2001, the date on which plaintiff was evicted. On those occasions, Underwood spoke with an adult male resident of the apartment, who said that a moving truck soon would arrive, but insisted the underlying indebtedness — *i.e.*, the past-due rent — had been paid. Underwood contacted Aimco's attorney to ask whether the debt had been paid, and learned that it had not been satisfied.

Accordingly, on January 3, 2001, Underwood executed the writ of restitution.[8] He provided the following narrative of events:

> 18.    As is the custom of the Sheriff's Department, I hired day laborers whose task it would be to remove the [plaintiff] and the [plaintiff's] property from the leasehold.
>
> 19.    I did not personally remove any property from the leasehold.

---

[6]*Id.*, Ex. A

[7]Doc. no. 26 (Affidavit of Jerry Underwood)

[8]Although the writ from the county court was technically categorized as a writ of "restitution," it was in essence a writ requiring the eviction of plaintiff from her apartment if she failed to pay her debt or to voluntarily vacate the premises.

20.     To the best of my recollection, I did not personally touch any of the property of the [plaintiff], with the exception of helping the laborers strap heavy furniture on a set of hand trucks.

21.     When I arrived at the leasehold that morning, the [plaintiff] was at the leasehold, together with the other adult occupant whom I had previously contacted.[9]

22.     The laborers whom I hired removed the property of the [plaintiff] from the leasehold, as did the [plaintiff], as did the adult living with the [plaintiff] in the leasehold.

23.     I recall specifically asking the [plaintiff], and the adult friend of the [plaintiff] previously referenced, to please assist in removing certain belongings from the leasehold.

24.     The day laborers whom I hired to remove the property from the leasehold are not professional movers, though I did instruct the laborers to use care in removing property from the leasehold.

25.     At no time did I damage any property of the [plaintiff], either deliberately, intentionally, negligently, or otherwise.

26.     At no time did I witness the day laborers damage any property of the defendant, either deliberately, intentionally, negligently, or otherwise.[10]

Plaintiff submitted affidavits offering a different version of the events of January 3, 2001, however, and it is that version which must be accepted as true for purposes of ruling upon defendant's motion.

Joey Dobnikar, who apparently is an acquaintance of plaintiff's husband, David

---

[9]This other "occupant" is plaintiff's husband, David Pearson.

[10]Underwood Affidavit, at 3-4.

Pearson, stated:

> On Jan. 3, 2001, at approximately 9:30, I received a phone call from David Pearson.  He explained to me that he need help move [sic] furniture, stereo equipment, a computer and other things.  I arrived approximately thirty  minutes later and I saw various items scattered in the common area between the apartment buildings.

> I saw the sheriff's helpers tossing various items off the front deck into the bushes and onto the concrete walkway.  I also saw, lying in the bushes and around the bushes and on the concrete and on the grass, several other items, including, a couch, chairs, bed frames, cabinets, electronic equipment.  A lot of it appeared broken, for example, on the furniture, the legs were cracked or knocked off and couch [sic] was broken in two and the stereo casing was smashed off and the stereo equipment was all busted up.  I also saw a smashed dresser there in several pieces.  I saw many video and audio cassettes where the plastic frame was smashed as though they were deliberately thrown down on the concrete just for the purpose of smashing them.  There were pieces of plastic all over the ground and piles of tapes scattered everywhere.[11]

Plaintiff also submitted her own affidavit, stating that:

> On Jan. 3, 2001, at approximately 9:00, there was a knock on the door and David answered it and it was Deputy Sheriff Underwood and he introduced himself and said that he was here to take our stuff out of the apartment.  He said in a loud voice that everyone needed to get up and then he and his helpers came into the apartment.

> He told his helpers to start getting stuff now and they initially carried the items down the stairs.  I was standing in the living room next to the Sheriff and he walked over to the balcony and he walked out on the balcony and the men were coming back upstairs and he yelled at his helpers to starting [sic] putting this stuff off the balcony.  He pointed to a small cabinet and the rug and he said pile the stuff onto a rug and

---

[11]Doc. no. 28 (plaintiff's evidentiary submission), Exhibit 1 (Affidavit of Joey Dobnikas), at  1.

throw it off the balcony. They put books, and cassettes and CD's and other items onto the rug and picked it up and threw it over the balcony. Then they went back into the apartment and picked up chairs, tables, my couch, my stereo, my daughter's dresser, her bed, her books, her comforter, her games, her dolls, they emptied her whole room off the balcony, mattresses, box springs, lamps, end tables, coffee table, ash trays, the microwave off the balcony, three t.v.'s and three vcr's [sic] all went off the balcony.[12]

Finally, plaintiff submitted her husband's affidavit, which relates that:

On Jan. 3, 2001, at approximately 9:00, there was a knock on the door and I answered it and it was Deputy Sheriff Underwood and he introduced himself and said that he was here to take our stuff out of the apartment. He said in a loud voice that everyone needed to get up and then he and his helpers came into the apartment. I told him that my daughter and her friends were in the room and could we have a little bit of time. He said no. Everyone has to go and they have to go now. [Plaintiff] came at about this time and came to the living room.

I went back to my daughter's room and told them they had to get up and by the time I got back to the living room, the helpers were piling things onto a rug and threw it over the balcony. Then they went back into the apartment and picked up chairs, tables, my couch, my stereo, my daughter's dresser, her bed, her books, her comforter, her games, her dolls, they emptied her whole room off the balcony, mattresses, box springs, lamps, end tables, coffee table, ash trays, the microwave off the balcony, three t.v.'s and three vcr's [sic] all went off the balcony.

The Sheriff refused to let me help move objects. The Sheriff told me to stay and get out of his way.[13]

Plaintiff submitted photocopies of photographs that, she says, depict her

---

[12]*Id.*, Exhibit 2 (Affidavit of Diana Person), at 1.

[13]*Id.*, Exhibit 3 (Affidavit of David Pearson), at 1.

damaged personal property.  Although not particularly clear, the photocopies appear to show household effects lying on the ground.[14]

Plaintiff seeks monetary damages pursuant to 42 U.S.C. § 1983 for the alleged destruction of her property in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

## III. DISCUSSION

Section 1983 provides a means of seeking redress against governmental officials whose conduct under color of state law deprives a plaintiff of rights, privileges, or immunities secured by the United States Constitution or federal statutes. The statute was enacted for the express purpose of enforcing the Fourteenth Amendment.  *See Mitchum v. Foster*, 407 U.S. 225, 238-39 (1972).   The two essential elements of a § 1983 claim are:  (1) the conduct complained of was committed by a person acting under color of state law; and (2) this conduct deprived plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States.  *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *partially overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *see also Burch v. Apalachee Community Mental Health Servs., Inc.*, 840 F.2d 797, 800 (11th Cir. 1988) (*en banc*), *aff'd sub nom. Zinermon v. Burch*, 494 U.S. 113 (1990).

---

[14]*Id.* at Exhibit 4.

## A.    Color of State Law

As the Supreme Court explained in *American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40 (1999), "the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Id*. at 49-50 (internal punctuation marks and citations omitted); *see also, e.g.*, *Focus on the Family v. Pinellas Suncoast Transit*, 344 F.3d 1263, 1276-77 (11th Cir. 2003) (same); *Almand v. DeKalb County, Georgia*, 103 F.3d 1510, 1513 (11th Cir. 1997) (holding that, in order to prevail on a civil rights action under § 1983, a plaintiff must show that she was deprived of a federal right by a person acting under color of state law).

> A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state. [*Almand,* 103 F.3d at 1513.]   "The dispositive issue is whether the official was acting pursuant to the power he/she possessed by state authority or acting only as a private individual." *Edwards v. Wallace Community College*, 49 F.3d 1517, 1523 (11th Cir.1995).   It is firmly established that a defendant in a § 1983 suit acts under color of law when he abuses the position given to him by the State.  *United States v. Classic*, 313 U.S. 299, 326, 61 S. Ct. 1031, 1043, 85 L. Ed. 1368 (1941).

*Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001) (holding that a city manager was acting under color of state law for purposes of § 1983 when he raped a city employee in her apartment).

It is clear that Underwood was acting pursuant to the authority he possessed as

9

a deputy of the Jefferson County, Alabama Sheriff when he effected the eviction of plaintiff from her apartment pursuant to a state court writ of restitution.

## B.    Deprivation of a Constitutional Right

Plaintiff's complaint alleges that Underwood deprived her "of her right to be free from unlawful seizure . . . and deprivation of property rights in violation of the 4th, 5th and 14th Amendments of the U.S. Constitution and 42 U.S.C. § 1983."[15]  In her response to defendant's motion for summary judgment, she states that Underwood "violated her procedural and substantive due process rights under the Fourteenth Amendment and for unlawful seizure under the Fourth Amendment."[16]

### 1.    Fourth Amendment

The Fourth Amendment provides, in pertinent part, that "[t]he right of the people to be secure in their persons, *houses*, papers, and *effects*, against unreasonable searches and *seizures*, shall not be violated . . . ."  U.S. Const. amend. IV (emphasis

---

[15]Complaint (doc. no. 1), at ¶ 14.

[16]Doc. no. 29 (plaintiff's brief in opposition to defendant's motion for summary judgment), at 1.  In her response to Underwood's motion for summary judgment, plaintiff makes no argument in support of her claims of failure to train and "having an unlawful policy."  Accordingly, those claims are considered abandoned. *See, e.g., Chapman v. AI Transport,* 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.,* 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

supplied).[17]  A "seizure" under the Fourth Amendment "occurs when 'there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook County,* 506 U.S. 56, 61(1992) (quoting *United States v. Jacobsen,* 466 U.S. 109, 113 (1984)).

The United States Supreme Court considered an eviction as the basis for a Fourth Amendment seizure claim in the *Soldal* case cited above.  There, the Soldals owned and resided in a trailer home which was located on a rented lot in a mobile home park. 506 U.S. at 57-58.  The owner of the mobile home park instituted eviction proceedings against them.  *Id.* at 58.  Although Illinois state law required a judgment of eviction to be entered prior to dispossessing a tenant, the property owner chose to forcibly evict the Soldals two weeks prior to a court hearing on the eviction petition. *Id.*  Employees of the property owner:  disconnected the telephone; closed sewer and water connections; tore off the trailer's canopy and skirting; and towed the trailer away.   *Id.*   The Soldals' home eventually was returned to them, but it was badly damaged.   *Id.* at 59.  Several deputy sheriffs were present for the eviction,[18] even though they knew the property owner "did not have an eviction order and that its

---

[17]The Fourth Amendment was made applicable to the States by the Fourteenth Amendment. *See Soldal v. Cook County, Illinois,* 506 U.S. 56, 61 (1992); *Ker v. California,* 374 U.S. 23, 30 (1963).

[18]The sheriffs purportedly were called to the premises "to forestall any possible resistance." *Soldal,* 506 U.S. at 58-59.

actions were unlawful." *Id.* Even though the deputy sheriffs did not personally participate in removing the trailer home, they did refuse to accept a complaint from the Soldals about the owner's actions. The Soldals filed suit against the county and the owner of the trailer park, alleging a claim under Section 1983 for violation of their Fourth and Fourteenth Amendment rights. *Id.*[19]

The Supreme Court held that the seizure and removal of the Soldals' trailer home from the rental lot constituted a meaningful interference with their possessory interests in the property. *Id.* at 72.[20] The Court stated: "'reasonableness is still the ultimate standard' under the Fourth Amendment . . . . As is true in other circumstances, the reasonableness determination will reflect a 'careful balancing of governmental and private interests.'" *Id.* at 71. Because the defendants acted without a court order, their actions were unreasonable, and the Soldals' claim survived summary judgment. *Id.* at 72.[21] *See also Thomas v. Cohen,* 304 F.3d 563 (6th Cir. 2002) (recognizing a Fourth Amendment seizure claim when police officers assisted in evicting residents of a women's shelter without a court order).

---

[19]The Supreme Court considered only the Soldals' Fourth Amendment claim. *Soldal,* 506 U.S. at 60 n.5.

[20]One central focus of the Court's holding is that the Soldals' claim was cognizable under the Fourth Amendment even though no "search" or "privacy interests" were implicated. *Id.* at 60-72.

[21]The Seventh Circuit Court of Appeals had held below that, "because the police prevented Soldal from using reasonable force to protect his home from private action that the officers knew was illegal," there was sufficient state action to support a § 1983 claim. *Soldal,* 506 U.S. at 60 n.6. The Supreme Court declined to review that ruling on appeal. *Id.*

*Soldal* is distinguishable from the present case because, here, a court order *was* issued *before* the eviction took place. That fact does not foreclose plaintiff's Fourth Amendment claim, however, because destruction of property also can constitute an unlawful seizure under the Fourth Amendment. *See United States v. Ramirez,* 523 U.S. 65, 71 (1998) ("Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression.").

In *United States v. Jacobsen,* 466 U.S. 109 (1984), the Supreme Court held that the destruction of a small amount of cocaine by agents of the Drug Enforcement Agency, while conducting a field drug test, implicated the Fourth Amendment because it interfered with the suspect's possessory interests. *Id.* at 124-25. To determine whether the Fourth Amendment was violated, the Court assessed the reasonableness of the officers' conduct as follows: "'We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* at 125 (quoting *United States v. Place,* 462 U.S. 696, 703 (1983)). The Court ruled that the agents' actions were reasonable under the circumstances.

> The law enforcement interests justifying the procedure were substantial; the suspicious nature of the material made it virtually certain that the substance tested was in fact contraband. Conversely, because only a

> trace amount of material was involved, the loss of which appears to have gone unnoticed by respondents, and since the property had already been lawfully detained, the "seizure" could, at most, have only a *de minimis* impact on any protected property interest.

*Jacobsen,* 466 U.S. at 125.[22]

In the context of execution of a search or arrest warrant, destruction of property will be considered "reasonable" only if it was necessary to effectively execute the warrant. *See, e.g., Mena v. City of Simi Valley,* 226 F.3d 1031, 1041 (9th Cir. 2000) ("[O]nly unnecessarily destructive behavior, beyond that necessary to execute a warrant effectively, violates the Fourth Amendment.") (citations omitted); *Lawmaster v. Ward,* 125 F.3d 1341, 1349 (10th Cir. 1997) ("[B]ecause the touchstone of the constitutionality of an officer's conduct during a search is reasonableness, when executing a search warrant, an officer is limited to conduct that is reasonably necessary to effectuate the warrant's purpose.").

For example, in *Bates v. City of Fort Wayne,* 591 F. Supp. 711 (N.D. Ind. 1983), the district court held that it was reasonable for officers, in the course of executing a search warrant on a facility where drugs were believed to be stored, to detonate an explosive charge on the complex's double steel doors. *Id.* at 716, 722.

---

[22]Principles from Fourth Amendment seizure cases in the criminal context apply with equal force in the civil setting, including plaintiff's eviction-related allegations. *See Soldal,* 506 U.S. at 61-68 (holding that the Fourth Amendment applies equally in both the civil and criminal contexts, and relying on criminal cases dealing with execution of search warrants to support its Fourth Amendment analysis on eviction-related claims).

14

The need to quickly gain access to the facility, before drug evidence could be destroyed, justified the officers' destruction of the door. *Id.* It also was reasonable for officers to disturb, or even destroy, small items of property, because drugs could have been hidden in small places. *Id.* at 722.

Similarly, in *Lawmaster v. Ward,* 125 F.3d 1341 (10th Cir. 1997), the Tenth Circuit noted that it was reasonable for officers to break locks on a suspect's gun vault, because the officers needed to examine the contents of the vault in order to execute a search warrant for illegal firearms. *Id.* at 1350 n.3.

Finally, in *Williams v. Alford,* 647 F. Supp. 1386 (M.D. Ala. 1986), the district court held, in the context of a drug search, that it was reasonable for officers to knock holes in portions of the plaintiff's wall where they observed fresh plaster, because drugs can easily be hidden within a wall. *Id.* at 1391-92.

On the other hand, when the destruction of property is *not* reasonably necessary to execute a search warrant, courts will find a Fourth Amendment violation. In *Turner v. Fallen,* No. 92-C-3222, 1993 WL 15647 (N.D. Ill. Jan. 22, 1993), while officers were executing a search warrant for stolen clothing in a consignment shop, they broke open a cash register and file cabinet, and smashed glass display cases. *Id.* at *1. The district court found the plaintiff's allegations sufficient to establish that the officers' conduct was not reasonably necessary to execute the warrant. *Id.* at *4.

The officers did not attempt to obtain the plaintiff's cooperation in opening the cash register, file cabinet, and display cases with a key before resorting to damage of the property. *Id.  See also Mena,* 226 F.3d at 1041 (holding that breaking down two *unlocked* doors was not reasonably necessary to execute a search warrant).

The court finds the reasoning of these cases to be both analogous and persuasive.  In the present case, the destruction of plaintiff's personal property was *not* reasonably necessary to execute the writ of restitution issued by the state court. The object of the writ was to remove plaintiff and her property from the apartment, because she was delinquent in her rent payments.  Underwood and his helpers could have accomplished that objective by carrying the items down the stairs and into the courtyard.

Further, the "nature and quality of the intrusion" on plaintiff's possessory interests in her property outweighs any governmental interest that might be alleged to justify throwing items of furniture and other possessions off a second-floor balcony. *See Jacobsen,* 466 U.S. at 125 (court should balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion") (citations omitted).  The intrusion on plaintiff's property interests was severe, as much of her property was badly damaged, and some of it was even destroyed.  Even though state

governments have an interest in protecting the property rights of landowners and lessors by evicting tenants who do not pay rent, as well as enforcing valid court orders, none of the damage to plaintiff's personal property was necessary to further those interests. The government has *no* interest in destroying or damaging a tenant's possessions during the course of effecting an eviction order. Indeed, if anything, the government has an interest in ensuring that its officials *do not* unnecessarily damage an individual's property.

The damage and destruction of plaintiff's property during the course of her eviction constituted a "meaningful interference" with her possessory interests in that property. *See Soldal,* 506 U.S. at 61. As Underwood can offer no justification for the interference, it was an unreasonable seizure in violation of the Fourth Amendment. Accordingly, plaintiff's allegations, taken in the light most favorable to her, are sufficient to establish a Fourth Amendment claim.[23]

---

[23]Underwood asserts that neither he nor any of his workers damaged plaintiff's property. However, plaintiff's affidavits, which must be taken as true for purposes of this summary judgment motion, are to the contrary. Underwood also asserts that he did not personally touch any of plaintiff's property. That fact is immaterial, however, because even if Underwood did not personally touch plaintiff's property, plaintiff's affidavits establish that he directed his workers to toss the property over the balcony. Underwood's personal participation in the wrongful conduct is not required, because he either directed the conduct complained of, or knowingly, through the assertion of his authority as a government official, allowed it to happen. *See Soldal,* 506 U.S. at 60 n.5 (although deputy sheriffs did not personally participate in taking the plaintiffs' home, they were still subject to § 1983 liability, because they knew the owner's conduct was unlawful, and they refused to accept a complaint about the property owners' actions).

### 2.      Due Process claims

Plaintiff's due process claims, on the other hand, cannot survive summary judgment.

#### a.      Fifth Amendment claim

To the extent plaintiff still intends to pursue her Fifth Amendment due process claim, that claim must fail.  The protections of the Fifth Amendment to the United States Constitution extend only to the *federal* government.  *See, e.g., San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee,* 483 U.S. 522, 543 n.21 (1987); *Knoetze v. United States,* 634 F.2d 207, 211 (5th Cir. Unit B 1981).  Thus, because the only defendant to plaintiff's claims is a *county* officer, not an officer of the federal government, her Fifth Amendment claim will be dismissed.

#### b.      Fourteenth Amendment claims

#### i.      Substantive due process

Plaintiff's substantive due process claim under the Fourteenth Amendment also must fail, because that claim is subsumed by her Fourth Amendment seizure claim. The Supreme Court has recognized that "[c]ertain wrongs affect more than a single [constitutional] right and, accordingly, can implicate more than one of the Constitution's commands." *Soldal,* 506 U.S. at 70.  Even so, in this case, plaintiff's Fourth Amendment seizure and Fourteenth Amendment substantive due process

claims cannot both stand.  "[W]here a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process[,]' must be the guide for analyzing' the claim."  *Tinney v. Shores,* 77 F.3d 378, 381 (11th Cir. 1996) (quoting *Graham v. Connor,* 490 U.S. 386, 395 (1989)).

The Eleventh Circuit has held that deprivation of property during an eviction proceeding should be considered under the Fourth Amendment, not under substantive due process principles of the Fourteenth Amendment.  In *Tinney v. Shores,* 77 F.3d 378 (11th Cir. 1996), the plaintiffs' house trailer was seized before the plaintiffs were able to remove their personal possessions.  *Id.* at 380.  The plaintiffs asserted claims for violation of their Fourteenth Amendment substantive and procedural due process rights, and their Fourth Amendment right to be free from unreasonable searches and seizures.  *Id.*  The Eleventh Circuit upheld the district court's dismissal of the plaintiff's substantive due process claim, because that claim was subsumed by the Fourth Amendment claim.  *Id.* at 381.  The court stated that the Supreme Court's decision in *"Soldal v. Cook County* makes clear that the Fourth Amendment is the textual source of the Tinneys' constitutional protection."  *Id.*[24]

---

[24]In *Soldal,* the Supreme Court emphasized that its holding — when a wrongdoing implicates multiple constitutional rights, all relevant constitutional provisions should be considered in turn — did not conflict with its prior decision in *Graham v. Connor,* 490 U.S. 386 (1989).

Similarly, here, *Soldal* and other cases discussing the destruction of property during a seizure make it clear that Underwood's interference with plaintiff's property interests is properly considered under the Fourth Amendment, not under the more general principles of substantive due process.   Accordingly, the substantive due process aspect of plaintiff's Fourteenth Amendment claim is foreclosed by her Fourth Amendment claim, and it will be dismissed.

### ii.   Procedural due process

Plaintiff's *procedural* due process claim, however, is not automatically foreclosed by her Fourth Amendment claim.   *See Tinney,* 77 F.3d at 381-82 (considering plaintiff's *procedural* due process arguments, after ruling that plaintiff's *substantive* due process analysis was foreclosed by Fourth Amendment principles); *Thomas v. Cohen,* 304 F.3d 563, 572-80 (6th Cir. 2002) (conducting both procedural due process and Fourth Amendment analyses).   Nonetheless, after considering

---

*Graham* is not ... contrary [to the principle that each constitutional right implicated by a course of action should be considered in turn].   Its holding was that claims of excessive use of force should be analyzed under the Fourth Amendment's reasonableness standard, rather than the Fourteenth Amendment's substantive due process test.   We were guided by the fact that, in that case, both provisions targeted the same sort of governmental conduct and, as a result, we chose the more "explicit textual source of constitutional protection" over the "more generalized notion of 'substantive due process.'" [*Graham,*] 490 U.S., at 394-395, 109 S. Ct., at 1870-1871.   Surely, *Graham* does not bar resort in this case to the Fourth Amendment's specific protection for "houses, papers, and effects" rather than the general protection of property in the Due Process Clause.

*Soldal,* 506 U.S. at 70-71.

plaintiff's procedural due process allegations, the court concludes they are insufficient to survive summary judgment.

There are at least four elements of a procedural due process claim: (1) persons acting under color of state law (2) deprived plaintiff (3) of property (4) without due process of law. *See Parratt,* 451 U.S. at 536-37.

> "[A]n unauthorized *intentional* deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the 14th Amendment if a meaningful post-deprivation remedy for the loss is available." **The state's action is not complete unless and until it refuses to provide a post-deprivation remedy.**

*Tinney,* 77 F.3d at 382 (citing *Hudson v. Palmer,* 468 U.S. 517, 531 (1984)) (italicized emphasis in original, boldface emphasis supplied).

A post-deprivation remedy alone is sufficient if a pre-deprivation remedy would be "impracticable." *Fetner v. City of Roanoke*, 813 F.2d 1183, 1185-86 (11th Cir.1987) ("Post- deprivation remedies do not provide due process if predeprivation remedies are practicable."). "[A] predeprivation hearing is practicable when officials have both the ability to predict that a hearing is required *and* the duty because of their state-clothed authority to provide a hearing." *Burch v. Appalachee Community Mental Health Services, Inc.*, 840 F.2d 797, 802 (11th Cir. 1988) (emphasis in original). In *Tinney,* the Eleventh Circuit further elucidated the concept of

"impracticability":

> The question is whether the *state* can anticipate and therefore control the action of a state employee. *See Hudson,* 468 U.S. at 533, 104 S. Ct. at 3203. Once a state has established procedures for the effectuation of an attachment – which Alabama undisputedly has – it cannot predict whether or not, in a given situation, those procedures will be followed or ignored. Thus, as with an employee's negligence or an employee's intentional wrongful act, Appellants' actions in this case were not preventable beforehand by the state. Therefore, under *Parratt* and *Hudson,* no procedural due process violation occurs unless the state fails to provide the opportunity to redress the situation after the fact. The Tinneys argue *only* that the due process violation was complete at the time of the attachment, without regard to the availability of post-attachment remedies, and thus they have failed to establish a procedural due process violation. Because the Tinneys have not challenged the adequacy of Alabama's post-deprivation remedies, we have no occasion to decide whether Alabama law does in fact provide adequate avenues for making the Tinneys whole.

*Tinney,* 77 F.3d at 382 n.1. The plaintiffs in *Tinney* "failed to state a valid procedural due process claim because they [did] not allege[] that Alabama law provided them with an inadequate post-deprivation remedy." *Tinney,* 77 F.3d at 382.

All plaintiff offers in support of her procedural due process claim are the vague allusion in her complaint to violation of property rights under the Fourteenth Amendment, and the bare allegation in her brief that Underwood "violated her procedural and substantive due process rights . . . ."[25] Based on these allegations, plaintiff cannot establish that the eviction itself violated her procedural due process

---

[25]Doc. no. 29 (plaintiff's brief in opposition to defendant's motion for summary judgment), at 1.

rights.  She does not assert that Underwood failed to follow any required procedures prior to evicting her from her apartment, or that she did not receive prior notice of the eviction.   Indeed, Underwood's uncontroverted affidavit establishes that plaintiff received a copy of the writ of restitution authorizing the eviction.[26] Underwood's affidavit also establishes that he visited plaintiff's apartment on at least eight occasions prior to the eviction, in an effort to obtain plaintiff's cooperation in vacating the premises, and that he spoke to plaintiff's husband on several of those occasions.[27]

Plaintiff also cannot establish that the destruction of her personal property during the eviction violated her procedural due process rights.  She does not allege that Underwood failed to follow any required procedures prior to throwing her property off the balcony of her apartment.  Indeed, she does not even assert that there are any pre-deprivation procedures which *could* have been followed.  Further, the court notes that plaintiff's only remaining claims are against Underwood *in his individual capacity.*  Thus, plaintiff's procedural due process claim could succeed only if she offered evidence that *Underwood himself* failed to follow proper procedures available to him in his individual capacity.  She has offered no such

---

[26]Underwood Affidavit, at ¶¶ 5, 10.

[27]*Id.* at ¶¶ 12-17.

evidence.  Finally, Underwood's conduct could not have been anticipated by the state.

Therefore, it is dispositive that plaintiff failed to assert that Alabama law provides her

with an inadequate post-deprivation remedy.  *See Tinney,* 77 F.3d at 382.  Based on

all of the foregoing, plaintiff's Fourteenth Amendment procedural due process claim

will be dismissed.

## C.   Qualified Immunity

Underwood asserts he is entitled to qualified immunity from suit and liability

for civil damages.  The doctrine of qualified immunity protects governmental officials

who are sued under 42 U.S.C. § 1983 for money damages in their personal, or

individual, capacities, but only so long as "their conduct violates no clearly

established statutory or constitutional rights of which a reasonable person would have

known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also, e.g.*, *Thomas v.

Roberts*, 261 F.3d 1160, 1170 (11th Cir. 2001) (same).  Once the qualified immunity

defense is raised, it is the *plaintiff* who "bear[s] the burden of showing that the federal

'rights' allegedly violated were 'clearly established.'"  *Lassiter v. Alabama A & M

University Bd. of Trustees*, 28 F.3d 1146 1150 n.3 (11th Cir. 1994) (quoting *Barts v.

Joyner*, 865 F.2d 1187, 1190 (11th Cir. 1989)).

The Supreme Court has established a two-part test for evaluating whether a

defendant is entitled to qualified immunity.  The "threshold question" that must be

24

asked by the district court is whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the officer's conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 201 (2001).  The court has already determined that the facts, taken in the light most favorable to plaintiff, establish a violation of the Fourth Amendment.  Accordingly, the court will proceed to analyze the second aspect of the two-part inquiry: *i.e.,* "whether the right was clearly established." *Id.*  Because the facts asserted by plaintiff do not establish a violation of the Due Process Clauses of the Fifth and Fourteenth Amendments, the court need not address whether Underwood is entitled to qualified immunity with regard to those claims. *See id.* ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

In determining whether the unlawfulness of an official's actions was clearly established, "'the salient question is whether the state of the law [at the time of the unconstitutional act] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" *Williams v. Consolidated City of Jacksonville,* 341 F.3d 1261, 1270 (11th Cir. 2003) (bracketed alterations in original) (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)).  The Supreme Court has rejected this Circuit's requirement that the facts of previous cases must always be "materially similar" to

25

those facing the plaintiff.  *Hope*, 536 U.S. at 739.  Instead,

> [f]or a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell* [*v. Forsyth,* 472 U.S. 511,] 535, n. 12, 105 S. Ct. 2806, 86 L. Ed. 2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

*Hope,* 536 U.S. at 741 (bracketed alterations in original).

_____An officer can receive "fair notice" of his or her unlawful conduct in various ways.

First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law.*  This kind of case is one kind of "obvious clarity" case.   For example, the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful.

Second, if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then *turn to case law.* When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts.  *See Marsh* [*v. Butler County, Ala.*]*,* 268 F.3d [1014,] 1031-32 n.9 [11th Cir. 2001]. For example, if some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional *without tying* that determination to a particularized set of facts, the decision on "X Conduct" can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding "X Conduct" are

immaterial to the violation.  These judicial decisions can control "with obvious clarity" a wide variety of later factual circumstances.  These precedents are hard to distinguish from later cases because so few facts are material to the broad legal principle established in these precedents; thus, this is why factual differences are often immaterial to the later decisions.  But for judge-made law, there is a presumption against wide principles of law.  And if a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so "with obvious clarity" to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.

Third, if we have no case law with a broad holding of "X" that is not tied to particularized facts, we then look at precedent *that is tied to the facts.*  That is, we look for cases in which the Supreme Court or we, or the pertinent state supreme court has said that "Y Conduct" is unconstitutional in "Z Circumstances."  We believe that most judicial precedents are tied to particularized facts and fall into this category. . . . When fact-specific precedents are said to have established the law, a case that is fairly distinguishable from the circumstances facing a government official cannot clearly establish the law for the circumstances facing that government official; so, qualified immunity applies.  On the other hand, if the circumstances facing a government official are not fairly distinguishable, that is, are materially similar, the precedent can clearly establish the applicable law.

*Vinyard v. Wilson,* 311 F.3d 1340, 1350-52 (11th Cir. 2002) (emphasis in original).

Based on these principles, the court finds that Underwood violated plaintiff's clearly established Fourth Amendment right to be free from unreasonable seizures. Although the court has found no case specifically holding that throwing a tenant's property off a balcony during the course of an eviction constitutes a Fourth Amendment violation, such an identical case is not necessary to establish that

27

Underwood was on notice of his unlawful behavior.[28]   Supreme Court precedent clearly establishes that any "meaningful interference" with a plaintiff's "possessory interests" in her property constitutes a "seizure" under the Fourth Amendment.   *See Soldal,* 506 U.S. at 61; *Jacobsen,* 466 U.S. at 113.   The "meaningful interference" principle is not tied to any particularized set of facts.   Indeed, the Supreme Court has considered that principle in the context of evictions conducted without a court order, *see Soldal,* 506 U.S. at 61, and seizures of drugs for testing, *see Jacobsen,* 466 U.S. at 113.   The Eleventh Circuit also has considered the principle in the context of a self-help repossession of personal property.   *See Cofield v. Randolph Co. Com'n.,* 90 F.3d 468, 472-73 (11th Cir. 1996).

_____Further, the Supreme Court has clearly held that the unnecessary destruction of property can constitute a violation of the Fourth Amendment.   *See Ramirez,* 523 U.S. at 71; *Jacobsen,* 466 U.S. at 124-25.   Finally, it is clearly established that any intrusion by the government on an individual's property rights must be outweighed by "the importance of the governmental interests alleged to justify the intrusion." *Jacobsen,* 466 U.S. at 125 (quoting *Place,* 462 U.S. at 73).

---

[28]Further, the court recognizes that it cannot rely on cases from other jurisdictions to determine that a legal principle is clearly established.  *See Thomas v. Roberts,* 323 F.3d 950, 953 (11th Cir. 2003) ("In this circuit, rights are 'clearly established' by decisions of the Supreme Court, this court, or the highest court of the state in which the case arose.") (citation omitted).  Thus, the cases discussed in § III(B)(1), *supra,* dealing with reasonableness in the execution of search warrants, are not material to the determination of whether Underwood can assert qualified immunity.

_____These  principles are clearly established with "obvious clarity," such that any objectively reasonable governmental official in Underwood's position would have known that throwing plaintiff's property off the balcony, and causing much of it to be broken or destroyed, would violate federal law.  As set forth above, the destruction of plaintiff's personal property constituted a meaningful interference with her possessory interests in that property.   Additionally, Underwood offered *no* governmental interest to justify the interference, and certainly not an interest that outweighs the intrusion.   Accordingly, Underwood is not entitled to qualified immunity on plaintiff's Fourth Amendment claim.

### IV. CONCLUSION

In accordance with the foregoing, plaintiff has stated facts sufficient to establish a violation of the Fourth Amendment, and Underwood is not entitled to qualified immunity on that claim.  Accordingly, Underwood's motion for summary judgment on plaintiff's Fourth Amendment claim will be denied.  Underwood's motion for summary judgment will be granted with respect to plaintiff's Fifth and Fourteenth Amendment Due Process claims.  An appropriate order will be entered contemporaneously herewith.

_____

DONE this 24th day of May, 2005.

United States District Judge